UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARKUS MEYENHOFER and ANDREW RAGLAND,<br><br>Plaintiffs,<br><br>v.<br><br>LARSEN & TOUBRO INFOTECH LIMITED, and LARSEN & TOUBRO INFOTECH LLC<br><br>Defendants. | No. 19-cv-9349<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs Markus Meyenhofer and Andrew Ragland ("Plaintiffs") bring this action on behalf of themselves and a class of similarly situated individuals to remedy pervasive, ongoing race, national origin, and citizenship discrimination by Defendants Larsen & Toubro Infotech Limited and Larsen & Toubro Infotech LLC ("LTI") and allege as follows:

## NATURE OF THE ACTION

1. Larsen & Toubro Infotech Limited is an Indian company that provides information technology ("IT") software and services to clients in the United States and internationally. Larsen & Toubro Infotech LLC is a wholly owned subsidiary of Larsen & Toubro Infotech Limited. LTI's United States workforce consists of approximately 7,500 employees. While only about 12% of the United States' IT industry (the industry in which LTI operates) is South Asian, at least 95% (or more) of LTI's United States workforce is South Asian, and is primarily composed of visa holders from India. As discussed further below, this grossly disproportionate workforce is the result of LTI's intentional pattern or practice of employment discrimination against individuals who are not of South Asian race, who are not of Indian national origin, and who are not visa holders and its

1

utilization of employment practices that result in a disparate impact on these same groups. This discrimination is pervasive throughout the organization and extends to LTI's hiring, job placement, promotion, and termination decisions and practices.

2.   LTI's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiffs seek, on their own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress LTI's discriminatory practices.

**PARTIES**

3.   Plaintiff Markus Meyenhofer was born in the United States, is a United States citizen, is of Caucasian race, and is of American national origin. He is a resident of New York. Plaintiff Meyenhofer is a member of a protected class, as recognized by § 1981 and Title VII. Mr. Meyenhofer has exhausted his administrative remedies and has complied with the statutory prerequisites of filing a Title VII complaint by filing a charge against LTI with the U.S. Equal Employment Opportunity Commission ("EEOC"), and receiving a notice of right to sue.

4.   Plaintiff Andrew Ragland was born in the United States, is a United States citizen, is of Caucasian race, and is of American national origin. He is a resident of New York. Plaintiff is a member of a protected class, as recognized by § 1981 and Title VII. Mr. Ragland has also exhausted his administrative remedies and has complied with the statutory prerequisites of filing a Title VII complaint by filing a charge against LTI with the EEOC, and receiving a notice of right to sue.

5.   Larsen & Toubro Infotech Limited is a global consulting company that is headquartered in Mumbai with its U.S. headquarters in Edison, New Jersey. LTI is incorporated

in India.

6. Larsen & Toubro Infotech LLC is a wholly-owned subsidiary of Larsen & Toubro Infotech Limited and provides similar consulting services as its parent company. It is incorporated in India, organized in Delaware, and maintains its U.S. headquarters in Edison, New Jersey.

## JURISDICTION & VENUE

7. <u>Subject Matter Jurisdiction</u>. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f), *et seq*. and 42 U.S.C. § 1981(a). The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as this dispute is between citizens of the State of New York and a foreign corporation and the amount in controversy exceeds $75,000. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a foreign corporation.

8. <u>Personal Jurisdiction</u>. The Court has personal jurisdiction over LTI because it engages in continuous and systematic business contacts within the State of New York (including in New York City) and maintains a substantial physical presence in this State, including the operation of an office in Manhattan, New York.

9. <u>Venue</u>. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because LTI resides in this District, conducts business in this District, and engaged in discriminatory conduct in this District. Additionally, LTI engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including the operation of an office in Manhattan. Additionally, a substantial part of the events giving rise to this matter occurred in this judicial district. As discussed in further detail below, Plaintiff Meyenhofer applied for a position with LTI located in

Manhattan, and Plaintiff Ragland serviced LTI client Iconix Brand Group, Inc. in Manhattan prior to his discriminatory termination by the company. Finally, on information and belief, some or all of the employment records relevant to Plaintiff Meyenhofer's application and Plaintiff Ragland's employment and termination are maintained in this District.

## FACTUAL ALLEGATIONS

*Overview of LTI's Business Model*

10. LTI has thirteen offices in the United States and employs approximately 7,500 employees domestically. LTI earned over $1.35 billion in revenue in the past fiscal year, and derives approximately 69% of its revenue from the United States.

11. LTI operates on a project-based model and contracts with U.S. companies to provide IT-related services. Once LTI secures a contract with a client, it hires new employees (or contractors) to fill positions to service the client or selects existing employees for the project. External applicants, contractors, and existing LTI employees (including visa holders) must apply to and interview for these positions. Once a position servicing a client comes to an end (or if an employee is removed from a position), individuals are placed in an unallocated status, also known as being "benched." Once on the bench, individuals must again seek new positions within LTI, going through an application and interview process, just as external applicants must.

*Overview of LTI's Discriminatory Scheme*

12. LTI operates under a general policy of discrimination in favor of South Asians, Indians, and visa holders (effectively all of whom are South Asians from India) and against individuals who are not South Asian, not Indian, and not visa holders. This general policy of discrimination manifests itself in the same general fashion with respect to LTI's hiring, staffing, promotion, and termination decisions. It consists of at least four inter-related, mutually reinforcing

prongs, pursuant to which applicants, employees, and contractors outside of LTI's favored class are similarly disadvantaged and harmed.

13. First, LTI engages in a practice of securing H-1B visas (and other visas) for South Asian and Indian workers located overseas who LTI then selects to staff U.S. positions. The federal government annually awards 65,000 H-1B visas (plus an additional 20,000 for individuals with advanced degrees). These visas are awarded on a lottery basis. Given the cap on H-1B visas, companies compete to secure visas for prospective visa workers. Each year, companies submit H-1B visa petitions at the beginning of April for visas to be awarded later that year. H-1B visa petitions must identify an actual job at a specific location that the prospective visa worker will fill if awarded a visa.

14. To fulfill its employment preference for South Asians and Indians, LTI seeks to maximize the number of visas it receives each year from the federal government. LTI submits visa petitions for more positions than actually exist in the U.S. in order to maximize its chances of securing the highest number of available H-1B visas from the lottery process. This allows LTI to create an inventory of "visa ready" workers in India to fill positions in the U.S. when they become available.

15. To create this inventory, LTI submits fraudulent invitation letters in connection with its H-1B visa applications to increase its chances of securing the highest number of visas possible during the lottery process. An invitation letter is typically signed by LTI's client and attests to the need for certain employees to work onsite in the U.S. Rather than securing invitation letters from its client, on information and belief, LTI drafts and signs these letters itself, without its client's authorization. In fact, LTI is currently under investigation by the United States Citizenship and Immigration Services ("USCIS") for these fraudulent practices. In connection with

its H-1B visa applications for LTI client Apple, the company is alleged to have submitted fraudulent invitation letters to USCIS, purportedly signed by Apple in order to secure visas for certain onsite employees.

16. Through these practices, LTI has been able to secure visas for far more individuals than it actually has a present need for. For example, from 2013 to 2018, LTI received 9,785 new H-1B visas (or visa amendments) and almost 200 new L-1 visas (or visa amendments) – far more positions than could actually exist given that LTI only employs about 7,500 employees in the U.S.

17. All, or substantially all, of the individuals for whom LTI secures visas are South Asian (primarily from India). While both individuals located in the U.S. and individuals located abroad who are visa-ready are technically considered for open positions in the U.S., as a matter of corporate practice, visa-ready individuals are given preference. LTI's explicit preference to staff visa holders in U.S. positions minimizes or eliminates competition for the jobs from non-South Asians, non-Indians, and non-visa holders residing in the U.S. (including both external applicants/contractors and existing employees seeking those positions).

18. Second, LTI gives preference to South Asian and Indian applicants located in the U.S. over non-South Asian and non-Indian applicants in the U.S. LTI has an internal recruiting department responsible for locating talent within the U.S. These efforts are supplemented by third-party recruiting companies. On information and belief, both LTI's internal recruiters and its third-party recruiters give preference to locating and recruiting South Asian and Indian candidates, who are then given preference over comparably or better qualified non-South Asian candidates throughout the hiring process. As a result, LTI hires a disproportionately high percentage of South Asians and Indians within the United States that far exceeds the proportion of those individuals in the relevant labor market.

19. Third, because of its discriminatory preference for South Asians, Indians, and visa holders, LTI promotes such individuals at disproportionately high rates compared to non-South Asians, non-Indians, and non-visa holders. Employees receive quarterly and/or annual appraisals at LTI. The appraisals include a rating of either exceptional (meriting a bonus), acceptable (no Performance Improvement Plan issued), needs improvement (may result in the issuance of a Performance Improvement Plan), or transition out (resulting in termination), with transition out being the lowest possible appraisal score. Promotions and raises at LTI are tied to an employee's appraisal, and employees receiving appraisals of exceptional are more likely to receive a promotion from LTI. Because of LTI's preference for South Asians, Indians, and visa holders, these individuals are regularly awarded higher appraisal scores compared to those outside of these favored groups. As a result, South Asians, Indians, and visa holders are regularly promoted at substantially higher rates than others. This results in diminished career prospects for non-South Asian, non-Indian, and non-visa holding individuals, among other harms. The vast majority of LTI's managerial and supervisory positions in the U.S., along with its President, Chief Executive Officer, Chief Operating Officer, Independent Directors, and Executive Chairman roles, are filled by South Asian and Indian individuals.

20. Fourth, because of its discriminatory preference for South Asians, Indians, and visa holders, LTI terminates non-South Asians, non-Indians, and non-visa holders at disproportionately high rates. Additionally, because of LTI's preference for filling positions with South Asian and Indian visa workers and South Asian individuals hired within the U.S., non-South Asians, non-Indians, and non-visa holders are disproportionately relegated to the bench and unable to locate new assignments within the company. LTI has a policy to terminate employees who are on the bench for more than a few weeks. This results in substantially higher termination rates for non-

South Asians, non-Indians, and non-visa holders.

21. In addition to LTI's disparate treatment of non-South Asians, non-Indians, and non-visa holders, LTI engages in employment practices that have a disparate impact on non-South Asian and non-Indian applicants and employees alike. First, LTI's practice of relying on visa workers to staff U.S. positions results in available positions overwhelmingly going to visa holding South Asian and Indian individuals, to the exclusion of non-South Asian and non-Indian candidates. Second, LTI's practice of applying for large numbers of work visas results in available positions overwhelmingly going to visa holding South Asian and Indian individuals, to the exclusion of non-South Asians and non-Indians. Third, LTI's internal employee allocation practices result in available positions overwhelmingly going to South Asian and Indian individuals, to the exclusion of non-South Asians and non-Indians, who are then terminated at disproportionate rates. Fourth, LTI's appraisal process results in South Asians and Indians receiving higher scores, and as a consequence, receiving higher compensation, receiving more promotions, and being selected for positions more frequently than non-South Asians and non-Indians, thereby resulting in diminished compensation, career prospects, benching, and disproportionate termination for these individuals. In addition, LTI's hiring and staffing decision-making process, as a whole, results in available positions overwhelmingly going to South Asians and Indians to the exclusion of non-South Asians and non-Indians.

22. LTI's U.S. workforce reflects the result of its discriminatory scheme. While only about 12% of the U.S. IT industry is South Asian, at least 95% (or more) of LTI's United States-based workforce is South Asian and Indian, as is, the vast majority of its managerial and supervisory-level staff.

*Plaintiff Meyenhofer's Experiences*

23. Mr. Meyenhofer is an experienced and highly skilled consultant with considerable work experience in the banking and financial services industries. He has held the Series 7, 25, 55, and 63 licenses required for trading and soliciting securities. Mr. Meyenhofer began his career as a derivatives trader and clerk on the American stock exchange, working for Cohen, Duffy & McGowan LLC, a premiere market making and specialist firm, for almost seven years. He then spent three years executing equity orders on the New York Stock Exchange before transitioning over to consulting work in 2010. Since that time, Mr. Meyenhofer has provided consulting, business analyst, quality assurance, and testing to an array of banking and financial companies, including, for example, BNY Mellon, Bank of America Merrill Lynch, Credit Suisse, Morgan Stanley, and Wells Fargo. Mr. Meyenhofer has a wide array of skills that include derivatives, fixed income, equity, and commodities trading, project management, business analysis, defect management, and the planning and deployment of testing efforts.

24. Mr. Meyenhofer worked for LTI as a contractor from September 18, 2018 through May 2, 2019 in Newark, New Jersey. He was recruited for a Test Manager position servicing LTI client Broadridge Financial Services, Inc. ("Broadridge") by LTI's third party vendor, Emplofy, LLC. While Mr. Meyenhofer was employed by Emplofy, LTI directly controlled and supervised Mr. Meyenhofer's work. In this Test Manager role, Mr. Meyenhofer was responsible for overseeing the QA testing for a robust wealth management platform currently in development for Broadridge and its anchor client, UBS Wealth Management, USA. However, due to LTI's ineffective staffing for the project, Mr. Meyenhofer was shifted repeatedly to other roles. Shortly after joining the project, LTI moved Mr. Meyenhofer to the Delivery & Governance Program team, and later converted him to a Business Analyst role. However, despite these changes, Mr.

Meyenhofer performed well on the Broadridge client project and received no criticism from the client or LTI regarding his performance or otherwise.

25. Mr. Meyenhofer worked alongside approximately five LTI and Emplofy employees on the Broadridge project from September through December 2018. Two of these five employees were South Asian and Indian. However, in January 2019, LTI replaced Mr. Meyenhofer's Emplofy sales manager, Peter Coffey, with an LTI employee, David Mascarehas. Mr. Mascarehas quickly staffed the Broadridge project with five additional LTI employees on H-1B visas, all of whom were Indian. From February to April 2019, Mr. Mascarehas hired another eleven employees, the vast majority of whom were also H-1B visa holders from India who worked for LTI. One such individual, Dinesh Bhatt, was assigned to the project in early March to perform a technical business analyst role (similar to the role Mr. Meyenhofer had been performing for Broadridge). Mr. Bhatt is of South Asian race and Indian national origin and is significantly less experienced than Mr. Meyenhofer. LTI also assigned Ravi Tripathi to work with Mr. Meyenhofer and to assume some of his responsibilities. Mr. Tripathi is also South Asian and Indian, and had no prior wealth management experience.

26. On April 17, 2019, LTI informed Mr. Meyenhofer that his position servicing Broadridge would be coming to an end, despite the fact that LTI had just renewed his contract for three months at the end of March. Mr. Meyenhofer remained on the project for two weeks to provide a knowledge transfer to the team, including Mr. Bhatt, Mr. Tripathi, and the offshore QA team. LTI then terminated his employment on May 2, 2019 and replaced him with Mr. Bhatt on the Broadridge project. LTI terminated Mr. Meyenhofer pursuant to the discriminatory employment practices described above.

27. On May 15, 2019, Mr. Meyenhofer applied to a Senior Wealth Management

Business Analyst position with LTI through its third party staffing and recruiting vendor, Quantum World Technologies Inc. Had LTI hired Mr. Meyenhofer for this role, it would have directly controlled and supervised his work. The position was located in Manhattan, New York, servicing LTI client City National Bank. Mr. Meyenhofer was well qualified for the role given the depth of his experience in wealth management. After successfully completing an initial interview with Quantum World, Mr. Meyenhofer was invited to interview with LTI on May 24. Mr. Meyenhofer performed well in this interview, and was told that LTI would follow-up with him in the near future regarding the Business Analyst role. However, Mr. Meyenhofer never received any follow-up communication from LTI and he was not hired by the company. LTI did not hire Mr. Meyenhofer pursuant to the discriminatory employment practices described above.

*Plaintiff Ragland's Experiences*

28. Mr. Ragland is an experienced and highly skilled operations and delivery management professional with considerable work experience. Mr. Ragland first entered the IT industry in 1998 and has almost 30 years of professional experience. He specializes in second and third-level command centers, and has a wide array of skills that include systems installation and set-up, testing and evaluation, support system and database report programming, and incident and problem management. In his management-level roles, Mr. Ragland often oversees teams of both onsite and offshore resources. He has also frequently served as a client liaison in both customer relationship manager and onsite vendor engagement manager roles. For the past six years, Mr. Ragland has studied business relations between India and the United States and has strong communication skills as a result.

29. LTI hired Mr. Ragland in December 2017 and he began working for the company on January 22, 2018 as an IT Operations Manager. Shortly after his hire, he relocated from San

Antonio, Texas to Manhattan, New York to service LTI client Iconix Brand Group, Inc. At the time of his hire, a member of LTI's Human Resources department informed Mr. Ragland that he was being hired to service Iconix Brand Group as part of the company's long-term, three-year contract with the client.

30. Mr. Ragland reported to Pius Joseph, the project's Delivery Manager, and K Vishal Shivaswamy, the Project Manager, both of whom are South Asian and Indian. Both Mr. Joseph and Mr. Shivaswamy reside in India. Mr. Shivaswamy was initially Mr. Ragland's peer when he was hired on the project, but was later made Mr. Ragland's manager.

31. As the IT Operations Manager for the project, Mr. Ragland was responsible for LTI's insourcing and outsourcing effort. He oversaw LTI's offshore team, which consisted of approximately twenty individuals in India, and ensured that the contracted services were provided in a timely manner to Iconix Brand Group. LTI also employed a technician at the client site, Prashant Shetake, who is of South Asian race and Indian national origin, as well as a development team of approximately six or seven individuals who are also South Asian and Indian.

32. Mr. Ragland performed well in the IT Operations Manager role. The client was impressed with Mr. Ragland's performance, including his willingness to perform tasks not delineated in the parties' contract. For instance, Mr. Ragland introduced a change management system within Iconix Brand Group, oversaw the company's ticketing system, and built out various systems that the client lacked the necessary resources to develop.

33. Despite Mr. Ragland's strong performance, LTI never promoted him. Additionally, LTI provided him with a 2018 year-end rating of "acceptable," and as a result, Mr. Ragland received no year-end bonus. Mr. Ragland never received any criticism from LTI or the client regarding his performance or otherwise.

34. In early 2019, Mr. Ragland learned that LTI's project for Iconix Brand Group was coming to an end. LTI's Director of Human Resources and Talent Acquisition, Maya Menon, informed Mr. Ragland on February 1 that his last day working on the Iconix Brand Group project would be February 15, 2019 and that he would be placed on the bench. She stated that the company would look for another position for Mr. Ragland within LTI for the next two weeks, but that Mr. Ragland would be terminated on March 8, 2019 if the company failed to place him on a new project. Mr. Ragland then shared his updated profile with RPM, LTI's resource planning team.

35. While Mr. Ragland's Indian manager, Mr. Joseph, and the offshore Indian team were quickly allocated to other client projects, Mr. Ragland remained on the bench for three weeks. During this time, he received no contact from LTI, and was not invited to interview for a single position within the company.

36. On March 8, 2019, LTI terminated Mr. Ragland's employment. LTI terminated Mr. Ragland pursuant to the discriminatory employment practices described above.

## CLASS ACTION ALLEGATIONS

37. Plaintiffs bring this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for LTI's systematic pattern or practice of discriminatory employment practices based upon individuals' race, national origin, and citizenship. This action is brought on behalf of the following class:

> All non-South Asian, non-Indian, and non-visa holding individuals who (1) applied for positions with (or within) LTI in the U.S. and were not hired, (2) were employed by LTI (including contractors) but not promoted, and/or (3) were employed by LTI (including contractors) and were involuntarily terminated.

38. Members of the class are so numerous that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed to be in the hundreds or thousands. Furthermore, the class is readily identifiable from information and records in LTI's possession.

39. There are numerous questions of law and fact common to the class. Among the common questions of law or fact are: (a) whether LTI has engaged in a pattern or practice of discrimination against non-South Asian, non-Indian, and non-visa holding individuals in its hiring, staffing, promotion, and termination decisions; (b) whether LTI has intentionally favored South Asian, Indian, and visa-holding individuals in hiring, staffing decisions, promotions, and terminations and/or whether LTI has intentionally disfavored non-South Asian, non-Indian, and non-visa holding individuals in hiring, staffing, promotion/demotion, and termination decisions; (c) whether LTI's employment practices have resulted in a disparate impact against non-South Asian and non-Indian individuals; (d) whether LTI has violated § 1981; (e) whether LTI has violated Title VII; (f) whether equitable and injunctive relief is warranted for the class; and (g) whether compensatory and/or punitive damages are warranted for the class.

40. Plaintiffs' claims are typical of the class. All members of the class were damaged by the same discriminatory policies and practices employed by LTI, *i.e.*, they were denied the opportunity to fairly compete for and obtain employment with LTI, were denied positions and promotions within the company, and/or were terminated by the company.

41. Plaintiffs will fairly and adequately protect the interest of other class members because they have no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in class action employment discrimination litigation to represent them and the class.

42. Because of LTI's actions, which were taken intentionally and/or with reckless disregard for the federally protected rights of Plaintiffs and the class, Plaintiffs and the class have suffered substantial harm for which punitive damages are warranted.

43. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because LTI has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the class. Members of the class are entitled to declaratory and injunctive relief to end LTI's discriminatory policies and practices.

44. Class certification is appropriate pursuant to Rule 23(b)(3) for determination of the damage claims of individual class members because the issue of whether LTI engages in a pattern or practice of race, national origin, or citizenship discrimination and/or its corporate practices result in a disparate impact against non-South Asian and non-Indian individuals is common and predominates over individual issues of proof. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because, among other reasons, certification will avoid the need for repeated litigation by each individual class member. The instant case will be manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

45. In the alternative, class certification is appropriate pursuant to Rule 23(c)(4) to litigate Plaintiffs' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate LTI's discrimination. Certification under this rule is also appropriate to decide whether LTI has adopted a systemic pattern or practice of racial, national origin, and citizenship discrimination and/or has engaged in practices that have resulted in a disparate impact against non-South Asian and non-Indian individuals. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## CLAIMS

### COUNT ONE
### Disparate Treatment on the Basis of Race and Citizenship
### Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981

46. Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

47. This claim is brought by Plaintiffs on behalf of themselves and the Class.

48. Throughout the class liability period, LTI has engaged in a pattern or practice of discriminating against individuals who are not South Asian and not visa holders by: (a) knowingly and intentionally favoring South Asian and visa-holding individuals in employment decisions, including hiring, staffing, promotion, and termination decisions, (b) knowingly and intentionally disfavoring non-South Asian and non-visa holding individuals (including Plaintiffs) in employment decisions, including hiring, staffing, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of at least 95% (or more) South Asian employees (many of whom are visa holders).

49. As a direct and proximate result of LTI's intentional discrimination, Plaintiffs and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with LTI.

50. LTI's actions constitute unlawful discrimination on the basis of race and citizenship in violation of 42 U.S.C. § 1981.

### COUNT TWO
### Disparate Treatment on the Basis of Race and National Origin
### Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

51. Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

52. This claim is brought by Plaintiffs on behalf of themselves and the Class.

53. Throughout the class liability period, LTI has engaged in a pattern or practice of discriminating against individuals who are not South Asian or Indian by: (a) knowingly and intentionally favoring South Asian and Indian individuals in employment decisions, including hiring, staffing, promotion, and termination decisions, (b) knowingly and intentionally disfavoring individuals who are not South Asian or Indian (including Plaintiffs) in employment decisions, including hiring, staffing, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of at least 95% (or more) South Asian employees (primarily from India).

54. As a direct and proximate result of LTI's intentional discrimination, Plaintiffs and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with LTI.

55. LTI's actions constitute unlawful discrimination on the basis of race and national origin in violation of 42 U.S.C. § 2000e, *et seq.*

**COUNT THREE**
**Disparate Impact on the Basis of Race and National Origin**
**Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.***

56. Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

57. This claim is brought by Plaintiffs on behalf of themselves and the Class.

58. Throughout the class liability period, LTI has used discriminatory policies and practices related to hiring, staffing, promotion, and termination described herein that have resulted in a disparate impact on non-South Asians and non-Indians who, as a result, are disproportionately not hired, not selected for positions, not promoted, and/or terminated. These practices are neither job-related for the positions at issue nor consistent with business necessity.

59. LTI's actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000e, *et seq*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the class pray for relief as follows:

a. Certification of the case as a class action pursuant to Fed. R. Civ. P. 23;

b. Designation of Plaintiffs as representatives of the class;

c. Designation of Plaintiffs' counsel as counsel for the class;

d. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and the Civil Rights Act of 1866, 42 U.S.C. § 1981;

e. A permanent injunction against Defendants and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f. Order Defendants to adopt a valid, non-discriminatory method for hiring, promotion, termination, and other employment decisions;

g. Order Defendants to post notices concerning its duty to refrain from discriminating against employees on the basis of race, national origin, and citizenship;

h. Order Defendants not to retaliate against individuals who complain of racial discrimination, national origin discrimination, and citizenship discrimination;

i. Award Plaintiffs and the Class damages – including (without limitation) compensatory, exemplary, and punitive damages for the harm they suffered as a result of Defendants' violations of Title VII and § 1981;

j. Award Plaintiffs and the Class pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendants' discriminating against them in violation of Title VII and § 1981;

k. Award Plaintiffs and the Class front- and back-pay, instatement, reinstatement, and such other equitable relief as the Court deems just and appropriate;

l. Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

m. Award Plaintiffs and the Class such other relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs and the class respectfully demand a trial by jury on all issues properly triable by a jury in this action.

DATED: October 9, 2019

Respectfully submitted,

By: /s/Michael von Klemperer
Michael von Klemperer (motion for admission *pro hac vice* concurrently filed)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
mvk@kotchen.com

*Attorney for Plaintiffs and Putative Class*